**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

                    **-against-**

**ROBERT YEDID, ANDREW KAUFMAN, and**
**MARK JACOBS**

                              **Defendants**

**No. 1:25-CV-06704**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission"), for its Complaint against Defendants Robert Yedid, Andrew Kaufman, and Mark Jacobs, alleges as follows:

### SUMMARY

1.       This action involves insider trading by Defendants Andrew Kaufman and Mark Jacobs in the securities of numerous public companies based on material nonpublic information provided by Defendant Robert Yedid from at least 2019 through 2024.  During that time, Yedid was a Managing Director at a consulting firm that assists pharmaceutical and biotechnology companies with investor communications ("Consulting Firm").  In that role, Yedid obtained material nonpublic information about Consulting Firm's public company clients, including drug trial results, financial and regulatory information, and mergers and acquisitions.  Yedid repeatedly shared that material nonpublic information with his close friends Kaufman and Jacobs, who then engaged in lucrative insider trading.  Kaufman shared his illicit proceeds with Yedid by handing him envelopes of cash.

2.      Yedid's conduct violated the duty of trust and confidence he owed Consulting Firm and its clients.  During the relevant time, Consulting Firm handled "the creation of all [of its clients'] key investor-facing collateral materials, including corporate presentations, press releases, conference call scripts, corporate fact sheets, [investor relations] websites, shareholder letters, and Q&A documents."  To prepare these materials, Consulting Firm necessarily received material nonpublic information about its clients' businesses.  Yedid knew he was required to protect that information from public disclosure.  In addition to being a licensed securities professional – he held Series 7 and 24 licenses – Yedid was an experienced corporate insider and a board member of a public company.  He was also subject to the strict confidentiality clauses in the Consulting Firm's service agreements with its customers and he annually completed training in relevant insider trading and compliance policies.

3.      Nevertheless, Yedid repeatedly tipped his close friends, Kaufman and Jacobs, between 2019 and 2024.  Yedid and Kaufman, both in their late 60's, have known each other since college and were roommates early in their careers.  They dined together regularly, sometimes joined by Jacobs.  All three communicated regarding investment matters, both separately and in some cases on joint emails.

4.      Kaufman's and Jacobs' unlawful trading was lucrative for all three Defendants. Collectively, they traded in the securities of at least five issuers based on Yedid's tips.  Armed with material nonpublic information about drug trial results, regulatory news, earnings, and mergers, Kaufman and Jacobs purchased and sold shares and derivatives, netting more than $480,000 and $36,000, respectively.  Kaufman then kicked back half of his proceeds, net of taxes, to Yedid.

5.     By engaging in this conduct, Yedid, Kaufman, and Jacobs violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

6.     The Commission brings this action against Defendants pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] seeking a judgment from the Court: (a) enjoining Defendants from engaging in future violations of Section 10(b) and Rule 10b-5 thereunder by engaging in specified actions or activities relevant to such violations; (b) entering a conduct-based injunction restraining and enjoining Yedid from acting as or being associated with any broker or dealer; (c) ordering each Defendant to disgorge an amount equal to the profits gained and losses avoided as a result of the actions described herein, with prejudgment interest; (d) ordering each Defendant to pay a civil monetary penalty; and (e) entering an order prohibiting Yedid from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa(a)].

8.     Venue in this district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the sales of securities and acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.  Specifically, many of the securities purchases and

communications described in the Complaint occurred in this District.  In addition, Yedid's and Kaufman's primary residences are in this District.

## DEFENDANTS

9.    **Defendant Robert Yedid**, age 67, resides in New York, New York.  During the relevant period, Yedid served as a Managing Director of Consulting Firm and the relationship manager overseeing Consulting Firm's services to numerous public companies.  Yedid was formerly registered with several SEC-registered broker-dealers.  Most recently, he was associated with Brokerage, LLC ("Brokerage"), an affiliate of Consulting Firm.  Yedid held Series 7 and 24 licenses through Brokerage from 2016 to 2023, when he voluntarily surrendered his licenses.  Yedid majored in economics at Yale University and holds a Masters of Business Administration from Stanford University.  Yedid has served as a director of a publicly traded biotechnology company from October 2019 to January 29, 2025.  Consulting Firm fired Yedid in December 2024.

10.    **Defendant Andrew Kaufman,** age 67, resides in New York, New York and is retired.  Kaufman formerly worked in securities sales, trading, and research at a number of well-known registered investment advisers/broker-dealers.  He was previously associated with Commission registrants between 1997 and 2001 and held Series 7 and 63 licenses, among others.  Kaufman has an undergraduate degree from Yale University and graduated from the New York University School of Law.

11.    **Defendant Mark Jacobs**, age 77, resides in Malvern, Pennsylvania.  Jacobs was associated with 13 different Commission registrants between 1998 and 2011.  He has held Series 7 and 63 licenses, among others.  Jacobs has an undergraduate degree in finance from Rider University.

## RELEVANT ENTITIES

12.    **Consulting Firm** is a New York City-based investor relations consulting firm that specializes in assisting healthcare and life-science companies with investor communications and outreach.  It describes itself as the "largest integrated investor relations firm in healthcare and the life sciences[.]"  It "develop[s] . . . corporate presentations, press releases, conference call scripts, corporate fact sheets, [investor relations] websites, shareholder letters, and Q&A documents."  It also claims that its "relationships with the most impactful healthcare-focused investors allow [Consulting Firm] to . . . effectively convey your story."  Consulting Firm is a subsidiary of a parent that also owns a registered broker-dealer and investment bank and several other companies geared toward providing services to healthcare and life-science companies.

13.    **BioDelivery Sciences International, Inc.** ("BioDelivery Sciences") was a specialty pharmaceuticals company working on treatments for chronic conditions.  BioDelivery Sciences traded on Nasdaq under the symbol "BDSI."  On March 22, 2022, Collegium Pharmaceutical, Inc. acquired BioDelivery Sciences.

14.    **CincCor Pharma, Inc.** ("CincCor") was a clinical-stage biopharmaceutical company focusing on treatments for hypertension and chronic kidney disease.  CinCor traded on Nasdaq under the symbol "CINC."  On February 24, 2023, AstraZeneca PLC acquired CinCor.

15.    **Inspire Medical Systems, Inc.** ("Inspire") is a medical technology company focused on the development and commercialization of minimally invasive solutions for patients with sleep apnea.  Inspire trades on the New York Stock Exchange under the symbol "INSP."

16.    **NanoX Imaging, Ltd.** ("NanoX") develops medical imaging technology and other diagnostic medical products.  NanoX trades on Nasdaq under the symbol "NNOX."

17.     **Oncocyte Corporation** ("Oncocyte") is the developer of non-invasive tests for the early detection of cancer.  Oncocyte trades on the NYSE American under the symbol "OCX."

## FACTS

### I.     Yedid Had Access to Material Nonpublic Information and Knew He Had a Duty to Keep It Confidential

18.     As a Managing Director and relationship manager at Consulting Firm, Yedid's professional duties included advising public companies on how to communicate with investors regarding study results, financial performance, regulatory developments, and mergers and acquisitions.  To provide this advice and prepare suitable communications, Yedid necessarily required access to material nonpublic information.  As Consulting Firm has emphasized on its website, its team of finance and communications professionals will "successfully plan" investor communications on behalf of public companies.

19.     Yedid exploited his access to material nonpublic information through his role at Consulting Firm.  For example, and as detailed further below, Yedid misappropriated information he received in draft press releases and internal emails.  Further, given his role as a relationship manager, Yedid routinely communicated with senior client officers and employees.  Yedid thus obtained material nonpublic information in text messages and telephone calls and, as detailed below, sometimes disclosed it to Kaufman and/or Jacobs.

20.     Yedid knew he was required to keep client information confidential.  Handling confidential client information was an essential part of his job.  To reinforce Yedid's duty to protect that information, Consulting Firm's standard client contract, which governed its relationship with clients such as Inspire, CincCor, NanoX, and Oncocyte, had a numbered section for "Confidentiality."  It defined confidential information as "all non-public scientific, technical, business or financial information possessed or obtained by, developed for or given to

[the respective parties] which is treated by the Disclosing Party as confidential or proprietary, whether or not labeled 'Confidential.'"  The contract further stated that such information included, among many other things, "test results, clinical trials, . . . as well as all other information and other data which relates in any way of the Client's . . . finances, . . . sales, contracts or agreements[.]"  Finally, the contract emphasized that Consulting Firm "shall not disclose to any person who is not party to this Agreement, any Confidential Information of the Disclosing Party," with a limited exception for disclosure that is "absolutely necessary" to allow Consulting Firm to perform its duties under the contract or law.

21.     Yedid was also a licensed securities professional, holding Series 7 and 24 licenses through Brokerage.  In connection with his association with Brokerage, Yedid annually certified that he had reviewed Brokerage's compliance and insider trading policies.  Notably, the Brokerage insider trading policy explained that "tipping others" was prohibited.  It defined tipping as "disclosing to any person outside the Firm, including family members, any information concerning any company or other entity learned in the course of their activities with the Firm, whether or not such company or other entity is a client of the Firm."  The policy also stated, in all-capital letters on the first page, that "TRADING OR TIPPING ON THE BASIS OF INSIDE INFORMATION COULD ALSO RESULT IN CIVIL OR CRIMINAL LIABILITY."

22.     Further, in connection with his Series 7 and 24 licenses, Brokerage required Yedid to complete yearly compliance training, which covered topics such as material non-public information and insider trading.  The training materials included examples of material non-public information – such as, "[k]nown but unannounced future earnings or losses[,]" [p]ending or proposed merger[,]" "[p]roduct announcements or scientific achievements."  It also defined insider trading and explained the consequences of insider trading violations.

7

## II.    Kaufman and Jacobs Are Close Friends with Yedid

23.    Yedid and Kaufman have known each other since college at Yale and were roommates early in their careers. They have vacationed together, attended the weddings of their respective children, and live about four blocks apart.  During the relevant time period, they spoke regularly, including more than 160 phone calls between February 2017 and January 2023.  They also frequently dined together, with Kaufman sometimes handing Yedid envelopes of cash – Yedid's share of Kaufman's trading proceeds.

24.    Kaufman met Jacobs in the early 1990s when they worked together at a financial services firm.  Yedid and Jacobs had previously worked together in the financial services industry and maintained their friendship long after they began working for different employers.  Yedid and Jacobs also had at least 187 telephone calls between January 2017 and January 2023.

25.    The three men regularly emailed each other about investing and regularly met for dinner.  A January 24, 2020 email from Jacobs to Yedid, Kaufman, and a third friend, sums up their relationship: "I wanted to thank you for dinner Wednesday night.  Great to spend time with my long time, caring, and smart and savvy Wall Street…friends."

## III.    Kaufman and Jacobs Are Former Securities Professionals and Sophisticated and Experienced Traders

26.    Both Kaufman and Jacobs spent a significant portion of their careers in the securities industry and are sophisticated and experienced traders.  Kaufman formerly held positions in securities sales, trading, and research at multiple financial services firms, and was associated with Commission registrants between 1997 and 2001.  Kaufman also holds a law degree.  Jacobs has an undergraduate degree in finance and was associated with 13 Commission registrant financial firms between 1998 and 2011.  During the Relevant Period, both Kaufman and Jacobs were active and sophisticated securities traders, transacting regularly in multiple

accounts held at different brokerages.  In addition to purchasing and selling equities, including selling short, both traded in options.

**IV.    Yedid Repeatedly Tipped Kaufman and Jacobs, Who Both Traded Profitably on the Basis of That Information**

27.     On at least 10 occasions between 2019 and 2024, Yedid tipped material nonpublic information to Kaufman and Jacobs, who then traded on the basis of that information.  Yedid conveyed these tips both by phone and in person.  The trading was lucrative for all three men.

*Yedid Tipped Kaufman and Jacobs about BioDelivery Sciences' Acquisition by*
*Collegium Pharmaceuticals ("Collegium")*

28.     BioDelivery Sciences was a Consulting Firm client from 2015 to 2022.  As Yedid put it in a January 2022 email to BioDelivery Sciences, he and another "senior relationship professional" at Consulting Firm "devoted substantial time" to providing services to BioDelivery Sciences' management team.

29.     In December 2021 and early January 2022, BioDelivery Sciences and Collegium engaged in high-level discussions regarding a potential transaction or corporate combination.  BioDelivery Sciences' CEO at the time was directly involved in the negotiations.

30.     On January 5, 2022, Yedid received an email from a Consulting Firm colleague stating, "I am on a call with the team and the investor basically cornered [the CEO] into admitting they are considering a merger with Collegium.  He has a terrible poker face.  I think we need to give him a vague but firm way to avoid this question."  In response, Yedid asked, "which investor . . . ???"  Yedid subsequently responded, "Not Good!  Thanks for making me aware of this."

31.     On January 12, 2022, Collegium submitted a written and nonbinding proposal to acquire all of BioDelivery Sciences' outstanding shares for $4.60 per share.  Five days later, at

10:51 at night, Yedid asked a colleague to review Consulting Firm's client contract with BioDelivery Sciences for a "change of control provision."

32.     On the afternoon of January 19, 2022, Yedid and the Consulting Firm team had a call with BioDelivery Sciences.

33.     On January 23, 2022, Jacobs called Yedid, with the call lasting seven minutes.

34.     On January 25 and 26, 2022, BioDelivery Sciences rejected Collegium's initial proposal but granted it access to a data room.  Over the course of those two days, Jacobs bought 2,900 shares of BioDelivery Sciences across three brokerage accounts at an average of $3.68 per share.

35.     On January 26, 2022, Yedid had another call with BioDelivery Sciences. Following the call, he sent BioDelivery Sciences an email requesting "a payment of 9 months of fees at the closing of the transaction . . . ."

36.     On January 28, 2022, at 12:25 pm, Yedid called Kaufman; the call lasted three minutes.  Seventeen minutes later, Kaufman began buying 33,000 shares of BioDelivery Sciences at an average price of $3.65 per share.  Kaufman used accounts at five different brokerages to effectuate these purchases.

37.     Kaufman did not just buy stock.  Twenty-one minutes after his January 28, 2022 call with Yedid, he also began buying soon to expire, in-or-near the money call options on BioDelivery Sciences.  Specifically, he purchased 170 $3 calls expiring on February 18, 2022 for approximately $11,499.  He also bought 90 $4 calls also expiring on February 18, 2022 for approximately $707.

38.     A call option allows the holder to purchase the reference stock at an agreed-upon "strike price."  A put option, on the other hand, allows the holder to sell the reference stock at an

10

agreed-upon strike price.  A call option is "in the money" if the current market price of the reference stock is greater than the strike price.  For example, a call with a strike price of $3 is in the money if the stock is trading at $4.  A put option is in the money if the current market price is below the strike price.  Options can be used to bet on the movements in a stock price or to hedge other positions.  Most options can only be exercised during a fixed, limited period of time, such as one or three months.  Options that expire in the near future may be described as "short-dated."

39.    On January 31, 2022, Collegium submitted another proposal to acquire BioDelivery Sciences' common stock at $5.00 per share.  The next day, BioDelivery Sciences informed Collegium it would be willing to proceed with a merger at $5.60 per share.  The same day, at 2:47 pm, Yedid and Jacobs had a 16-minute call.

40.    On February 2, 2022, Collegium increased its offer to $5.30 per share.  Yedid's calendar reflected a weekly call with BioDelivery Sciences for February 3rd.

41.    On February 4, 2022, Yedid told a colleague that "I tried calling [the CEO] again today, for the second time, and he keeps saying he's not available.  either [sic] he's super busy [sic] we're selling the company?  😉"  Later that day, Collegium submitted an all-cash offer to buy BioDelivery Sciences' shares at $5.60 per share.  Meanwhile, the same day, Jacobs bought an additional 1,300 shares across two brokerage accounts at an average price of $3.62.

42.    On February 6, 2022, at 12:23 pm, Yedid sent BioDelivery Sciences an outline to help with internal and external communications following its acquisition.  At 8:13 that night, Yedid called Jacobs and the two eventually spoke for five minutes.  At 8:28 pm, Yedid called Kaufman, with the call lasting two minutes.

43.    On February 7 and 8, 2022, Jacobs bought an additional 1500 shares of BioDelivery Sciences across four brokerage accounts at an average price of $3.72 per share.

44.     Finally, before the market opened on February 14, 2022, BioDelivery Sciences announced it agreed to be acquired by Collegium at $5.60 per share.  The next day, Kaufman promptly sold or exercised the call options and sold all 33,000 of his BioDelivery Sciences shares for a total profit of approximately $106,917.  Between February 15 and 22, 2022, Jacobs sold his shares for profits of $10,652.

*Yedid Tipped Kaufman and Jacobs about CinCor Pharma, Inc.'s ("CinCor") Positive Drug Trial Results*

45.     Yedid was Consulting Firm's relationship manager for CinCor.  On July 6, 2022, Yedid emailed CinCor to ask about the status of the drug trial for a CinCor hypertension drug called Baxdrostat.  Yedid's email included a "Weekly Call Agenda" and noted that Baxdrostat's trial results may arrive at the end of July.  Accordingly, Yedid noted, there was a "draft in progress" of a CinCor press release.

46.     On July 11, 2022, Jacobs called Kaufman.

47.     On July 13, 2022, CinCor's Chief Financial and Business Development Officer ("CFO") learned that the Baxdrostat trial had positive results.  The same day, Yedid wrote an internal email describing a text exchange with the CFO.  Yedid said that "it sounds like the [Baxdrostat trial] data readout may be positive and they could have the data ready for release by July 28, 29, or August 1."

48.     On July 16, 2022, Kaufman called Yedid.

49.     On July 19, 2022, at 8:19 am, Yedid spoke with the CFO.  Yedid later received a high-level "development deck" about the Baxdrostat trial from another CinCor employee.  At 10:51 am, Yedid emailed his Consulting Firm colleagues, stating: "I spoke with [CFO] today and she said the data readout will likely be around Aug. 8th rather Aug. 1 due to [a] delay in pulling together the data."

50.     That evening, at 7:06 pm, Yedid called Kaufman.  The next morning, at 10:20 am, Kaufman purchased 3,000 shares of CinCor stock at an average price of $25.52 per share.  In a different brokerage account, Kaufman bought another 2,500 shares at an average price of $24.77 per share.

51.     The same day, July 20, 2022, Yedid received the CinCor weekly meeting agenda, which noted that the Baxdrostat trial results will be released the week of August 8th, 2022. Jacobs also called Yedid, with the call lasting 99 seconds.

52.     Kaufman's purchases continued the next day.  On July 21, 2022, Kaufman bought 2,000 more CinCor shares in the first brokerage account at approximately $23.37 per share, and another 500 shares in the second account at $24 per share.  The same day, CFO emailed a colleague of Yedid's at Consulting Firm with a copy of a draft press release about the Baxdrostat trial.  The CFO's email noted that she just got off the phone with Yedid and instructed the colleague to call Yedid, who would explain the context of the draft.

53.     On July 22, 2022, Yedid received a set of slides reflecting the Baxdrostat trial results.  The slides are labeled "highly confidential."

54.     On July 31, 2022, Yedid called Jacobs, and the call lasted 100 seconds.  Between August 1 and 4, 2022, Jacobs used two brokerage accounts to buy a total of 1,000 CinCor shares at an average price of $22.73.

55.     On August 5, 2022, Kaufman purchased 2,000 more CinCor shares at an average price of approximately $23 across two brokerage accounts.

56.     CinCor disclosed the positive Baxdrostat results before the market opened on August 8, 2022.  Analysts and the market were impressed.  Oppenheimer wrote "we believe the totality of the [Baxdrostat] data exceeds our best-case scenario" and it upgraded its price target

from $35 to $60.  Morgan Stanley wrote "we are encouraged by the data, and the positive update increases our confidence for Baxdrostat in contraindications . . . ."  Morgan Stanley also upped its CinCor price target from $31 to $45.  Jefferies wrote: "Strong Phase II treatment resistant data hit our 'home-run' scenario and should support stock upside and the view [the drug] could be a [potential] blockbuster cardiology pill."  Jefferies also raised its price target from $30 to $50.

57.     CinCor stock closed on Friday, August 5, 2022 at $23.45.  After the news, it closed at $35.00 on August 8, 2022, up 49.25 percent on significantly higher than typical volume.

58.     On August 8, 2022, Jacobs sold 300 CinCor shares and continued to hold 700 shares, earning him realized and unrealized illicit profits of $11,024.  Between August 9 through 11, 2022, Kaufman sold 2,000 CinCor shares and continued to hold 8,000 shares.  He thus earned a total of $81,963 in realized and unrealized illicit profits.

*Yedid Tipped Kaufman about Inotiv's Delayed Financial Results*

59.     Inotiv is a contract research company that provides drug discovery and development services to pharmaceutical and medical device companies.  In early May 2024, Yedid was Consulting Firm's investor relations contact for a press release and 10-Q in which Inotiv planned to disclose that it was delaying the release of its quarterly financial results, and that the reason for the delay was that it needed additional time to complete accounting analyses related to a Department of Justice investigation and ongoing settlement talks.

60.     Inotiv issued the press release on May 9, 2024.  Four days later, it filed a form NT 10-Q providing additional details.  The filing disclosed a revenue estimate miss and a potential adverse impact on debt covenants.  It also included a "going concern" statement, raising the possibility that it would be unable to continue as a company.

61.    Yedid tipped this material nonpublic information to Kaufman before it became public.  On May 7 and 8, 2024, Kaufman sold short 20,000 Inotiv shares across three accounts, yielding proceeds of $95,706.  An investor who sells short is betting that the price of a stock will drop.  A short-seller borrows shares and sells them, paying a finance charge to the lender but otherwise keeping the sale proceeds.  Then, if, as hoped, the market price drops, the short-seller purchases the shares at a lower price than he sold them at, and returns the shares to the lender.  This is called "covering" a short.  His profits are the difference between the sale proceeds and the subsequent purchase cost.

62.    Following the filing of the Form NT 10-Q on May 13, 2024, including the "going concern" statement, the price of Inotiv's stock dropped more than 49 percent.  Between May 14 and 22, 2024, Kaufman bought 20,000 shares to cover his short position for a cost of approximately $40,442, yielding an illicit profit of $55,264.

*Yedid Repeatedly Tipped Kaufman and Jacobs Ahead of Public Announcements by Inspire*

63.    Yedid was involved in a series of Inspire public announcements between 2019 and 2022.  At least two of these announcements listed Yedid as the investor relations contact.  Prior to these announcements, Yedid tipped material nonpublic information to Kaufman and Jacobs – tips that, at least in some cases, Kaufman noted in the calendar on his phone.

64.    For example, Inspire was expected to announce its second quarter 2022 financial results on August 2, 2022.  On July 16, 2022, Kaufman called Yedid.  Four days later, Kaufman bought 400 shares of Inspire at an average price of $204.25 per share.

65.    A calendar entry on Kaufman's phone for August 3, 2022 stated: "Subject: Check INSP options[.]  7/21/22 RAY [Robert A. Yedid] – announce 8/2 (stock - ~ 205 when we speak);

Shortest Calls at 8.19[.]"  On July 29, 2022, Kaufman bought five Inspire August 19, 2022 call

options with a strike price of $210 for a total cost of $4,300.

66.     After market close on August 2, 2022, Inspire announced its second quarter 2022

results and updated its 2022 outlook.  Yedid was listed as the investor contact.  On August 3,

2022, Inspire's stock price rose from $216.83 to a high of $230.40, closing at $218.27.

67.     That day, Kaufman sold his now in-the-money $210 call options for $6,676, an

illicit profit of approximately $2,376.  He also sold 300 Inspire shares at an average price of

$216.33 per share for profits of $3,700.  (He had sold 100 of the 400 shares he purchased on July

21st, prior to Inspire's announcement.)

68.     That episode continued a long-standing pattern.  In another example, after market

close on November 2, 2020, Inspire released very positive third quarter 2020 financial results.

The accompanying press release, listing Yedid as the investor contact, emphasized that Inspire

had significantly beat its revenue estimate and increased its 2020 revenue outlook.  The market

reacted positively, with Inspire's stock price increasing 32 percent, to $160.50, by market close

on November 3, 2020.  Analyst commentary was effusive, including headlines like "INSP

Crushes 3Q" and commentary that described "significantly better than expected" results.

69.     Yedid had tipped both Kaufman and Jacobs about Inspire's impending November

2nd announcement.  Yedid and Jacobs had two calls on October 11, 2020, lasting a combined

four minutes.  Yedid also had a call with Kaufman, lasting five minutes.  An October 17, 2020

call between Yedid and Kaufman lasted another two minutes.  The October 18, 2020 calendar

entry on Kaufman's phone revealed the extent to which Yedid and Kaufman coordinated

Kaufman's trading so that both could profit.  It read: "Subject: Buy INSP 10/18 f/RAY – buy

before the 11/2 Earnings Release – Sell after that release.  **$65k for of RAY and I = 500 shares each**.  Note stock has run from ~16 to ~130.”  (emphasis added).

70.    Kaufman’s behavior tracked his calendar entry.  On October 28, 2020, he bought a total of 1,000 Inspire shares in two accounts for an average cost of approximately $123 per share.  He was so certain that he purchased 550 of these on margin, for over $67,000.

71.    Prior to the release on November 2, 2020, Jacobs bought 100 Inspire shares at an average price of just over $122 per share.  Kaufman’s calendar entry for that day includes: “Subject: Sell INSP 11/2 – Pre-Release: Expectations: $72/sh EPS, $22.75 mm Revs.”  Mistakenly assuming that Inspire had issued its financials *before* market open, Kaufman sold all the shares he had purchased during the trading day on November 2nd.  Inspire released its financials after the close of business that day.

72.    Following the announcement, on November 3, 2020, Jacobs sold his 100 shares for illicit proceeds of just under $2,200.

73.    Similarly, on February 5, 2019, Inspire announced that five additional Blue Cross plans with more than sixteen million members would cover Inspire’s sleep apnea therapy.  Following this news, the price of Inspire stock rose from $52.34 at the end of the day on February 4, 2019, to $54.65 at the close on February 5, 2019, or 4.41 percent.

74.    The day before, February 4, 2019, he had a short call with Yedid at 1:42 pm.  Just over two hours later, Kaufman purchased 6,000 Inspire shares across two accounts.  In one account, he used his entire available balance – approximately $209,000 – to purchase 4,000 shares.  Following the announcement, he immediately sold all 6,000 shares for profits of just under $2,900.

75. A few months later, Inspire made two positive announcements on successive days. First, it announced on May 6, 2019 that an additional 112 million people would be covered by Blue Cross for Inspire's main product. The next day, Inspire disclosed positive financial results for the first quarter 2019 on May 7, 2019, including a 62% growth in revenue over the first quarter 2018 and an increase in annual guidance. Kaufman and Jacobs both traded ahead of these announcements.

76. On May 3, 2019, at 11:06 am, Yedid called Kaufman, with the call lasting four minutes. Roughly two hours later, Yedid called Jacobs for an 11-minute call. Those calls prompted both Kaufman and Jacobs to start buying. In the hours following his call, Jacobs bought 600 Inspire shares across three accounts for an average price of $51.18. Kaufman began buying on May 3rd, eventually buying 6,000 Inspire shares by May 6th at an average price of just over $51 per share.

77. After the market closed on May 6, 2019, Inspire announced that an additional 112 million people would be covered by Blue Cross for Inspire's main product. The announcement listed Yedid as the investor contact. The stock, which opened at $51.20, closed at $54.06. Jacobs sold 100 shares the next day.

78. Inspire announced its positive financial results after the market closed on May 7, 2019. Yedid was again listed on the press release as the investor contact. The stock hit a high of $54.90 on May 7 before closing at $52.18.

79. Kaufman sold 6,000 Inspire shares on May 8, 2019 for an average price of $52.47 and illicit profits of $7,588. The same day, Jacobs sold 200 Inspire shares for an average price of approximately $53.61 and illicit profits of $1,192. He also held another 300 Inspire shares for unrealized profits of approximately $560.

*Yedid Tipped Kaufman about NanoX's Material Nonpublic Information*

80.    On May 2, 2021, Yedid received copies of NanoX's financial statements for the first quarter 2021, along with a draft press release.  The draft press release disclosed that a company supplier had delayed a critical component, which would delay NanoX product shipments.  Between May 2 and 7, 2021, Yedid sent and received multiple emails regarding the press release and a related script for a conference call to be held after the press release was issued.  For example, on May 2, 2021, he received an email from a colleague that stated: "Attached are the updated [NanoX] Q1 numbers into the revised release and script that [] sent around this morning.  I'm also attaching the latest financials that [] sent around this afternoon."

81.    On May 5, 2021, Yedid and Kaufman had a two-minute phone call.  Between May 5 and 7, 2021, Kaufman sold 8,000 NanoX shares short at an average price of $29.48 per share.  A calendar entry for Kaufman's phone for May 7, 2021, reads "RAY Earnings < [before] open on Tue, 5/11 Short?"  That day, Kaufman purchased numerous short-dated, out-of-the-money $28.50 to $30 put options, all expiring on May 14, 2021.

82.    A May 11, 2021 calendar entry on Kaufman's phone reads: "RAY – 5/2021 – **will miss earnings** . . . . To be announced on Tues 5/11 BEFORE Check cover NNOX." (emphasis added).  Before markets opened on the 11th, the press release disclosed the supplier and shipment issue, causing NanoX's stock price to decline by over 18 percent.  Kaufman covered his short position that day and closed out his options, reaping a combined $78,624 in illicit proceeds.

83.    Yedid and Kaufman were not done exploiting NanoX's material nonpublic information.  On July 25, 2021, Yedid spoke with NanoX's CEO, who told Yedid that NanoX had "two acquisitions where the board is not yet signed off."  On July 29, 2021, Yedid received a

copy of NanoX's financial statements. Three days later, he received a draft script for an analyst conference call to coincide with the release of NanoX's financials. The draft script noted both the potential acquisitions and, importantly, significant management changes, including the announcement of a new CEO and the departure of the CFO.

84. On August 2, 2021, Yedid received and commented on a draft press release that noted the financial results, acquisitions, and management changes. The next day, Yedid and Jacobs had a six-minute phone call.

85. On August 4, 2021 Jacobs, betting that the NanoX stock would go down, bought a NanoX $29 put, expiring on August 13, 2021, and sold two NanoX calls for combined proceeds of just under $290. The following day, Jacobs sold short 100 NanoX shares at $30.10 per share. He followed that on August 6, 2021 by purchasing two NanoX puts with a strike price of $29, expiring August 13, 2021.

86. An August 6, 2021 calendar entry on Kaufman's phone reflects that he had dinner with Yedid. On the 6th, Kaufman sold short 4,000 NanoX shares at an average price of $30.17. Between August 6 and August 10, 2021, Kaufman also bought 60 out-of-the-money NanoX puts at strike prices between $27 and $30, all expiring on August 13, 2021.

87. On August 10, 2021, at 7:52 am – before the market open and before NanoX announced its financials minutes later – Jacobs sold 100 NanoX shares at $30.00 per share, allowing him to avoid losses. He had purchased those shares on August 4, 2021.

88. At 8:00 am on August 10, 2021, NanoX announced its second quarter 2021 financials and disclosed the management changes and acquisitions. Analysts and the market reacted negatively to the disclosures, with NanoX's stock suffering a 13 percent decline by close

of business that day.  Taking advantage of this sudden drop, Kaufman promptly covered his short positions and sold his put options for combined illicit profits of $28,958.

89.     Between August 10 and 12, 2021, Jacobs sold the three $29 NanoX puts for illicit profits of $365.  On the 10th, he also covered his short sale by buying 100 NanoX shares at $26.41, for illicit profits of $369.

90.     Over the ensuing two weeks, Yedid and Kaufman used the same pattern to again earn illicit trading profits.  On August 12, 2021, NanoX received a letter from the Food and Drug Administration ("FDA") noting deficiencies in NanoX's premarket submission for approval of the NanoX.ARC medical imaging device.

91.     On August 18, 2021, at 2:41 pm, Yedid was forwarded an internal email thread in which Consulting Firm personnel weighed how NanoX should disclose the FDA letter.  The employee who forwarded the thread to Yedid suggested that "Bob [Yedid] or [another Consulting Firm employee] should answer" a question about whether NanoX should send a statement to the website MarketWatch.  Yedid responded almost immediately, noting that "if we plan on making a press release tomorrow morning, then we MUST notify NASDAQ and MarketWatch at least 10 minutes prior to the release time.  I would suggest an 8:00 am release time."

92.     Less than 20 minutes after sending that email, Yedid and Kaufman had a one-minute call.  Immediately after the call, beginning at 3:05 pm, Kaufman sold short 2,000 NanoX shares at $24.35.  Five minutes after that, Kaufman used three brokerage accounts to buy thirty $24 puts, thirty $23.50 puts, and fifty $23 puts, all expiring on August 20, 2021.

93.     Between 3:42 and 4:21 pm, Yedid received drafts of NanoX's proposed 6-K filing and provided responses, reviewed the draft, and signed off.  Before the market opened the following morning, August 19, 2021, Yedid wrote to NanoX that he "would recommend making

this filing be made [sic] before the market opens today, since the letter from the FDA was received on August 12th."  Yedid, emphasizing the materiality of the information, continued: "Many investors will regard this information as important and would like to learn about it promptly."

94.     NanoX heeded his advice and filed an SEC Form 6-K on the morning of the 19th, which disclosed that NanoX's submission to the FDA was on hold pending NanoX's response to the FDA's list of deficiencies.  Analyst coverage of the disclosure ranged from negative to concerned, and NanoX's stock price closed down 9.5 percent that day.  Kaufman promptly covered his short position and sold his put options for total illicit proceeds of $23,852.

*Yedid Tipped Kaufman and Jacobs about Oncocyte's Positive Trial Results*

95.     Oncocyte develops non-invasive blood and urine diagnostic tests (liquid biopsies) for the early detection of cancer.  On January 29, 2019, Oncocyte announced the positive results of a research and development validation study demonstrating the accuracy of a liquid biopsy test called DetermaVu for lung cancer.  Analysts and investors celebrated the good news; the price of Oncocyte's stock increased over 207 percent in one day.  As one analyst put it, "Oncocyte's novel technology in the compelling lung cancer market is proving to be a diagnostic breakthrough . . ."  The analyst added that "[t]he positive result of the R&D Validation Study is a great indicator of how commercially viable DetermaVu will be moving forward."

96.     Yedid tipped Kaufman and Jacobs about the information before it became public, allowing them to earn substantial trading profits.

97.     Yedid learned of the study on November 18, 2018.  He and Kaufman had a two-minute phone call the next day.  They would have another phone call – lasting three minutes – on January 4, 2019.

98.     On January 10, 2019, Oncocyte informed Yedid and other Consulting Firm employees that the study had a positive outcome.  On or about that day, Oncocyte began working on a press release announcing the results.  Yedid was involved in preparing that press release and would eventually be listed on it as the investor contact.  On both January 13 and 14, 2019, Yedid received calls from Oncocyte's Chief Financial Officer, with the call on the 13th lasting five minutes.

99.     Between January 15 and 22, 2019, Kaufman bought 27,004 Oncocyte shares across two brokerage accounts.

100.     On January 25, 2019, at 10:01 am, Yedid and Jacobs had a two-minute phone call. At 3:33 that day, Jacobs began purchasing 2,600 Oncocyte shares at an average of $1.90 per share.

101.     After Oncocyte disclosed the positive news on January 29, 2019, Kaufman sold all 27,004 shares for illicit profits of $97,560, while Jacobs sold his shares for $9,467 in illicit profits.

102.     A few months later, the Financial Industry Regulatory Authority ("FINRA") asked Oncocyte to identify those with material non-public information about the study before its public disclosure.  Oncocyte reported that Yedid had material non-public information no later than November 18, 2018.  Oncocyte then asked Consulting Firm to identify anyone who may have known certain traders in Oncocyte, including Kaufman.  Consulting Firm forwarded that request, which made it clear the information would be provided to FINRA, to Yedid and others. In response, on May 10, 2019, Yedid admitted he knew Kaufman as a friend and that he saw him "a few times a year for dinner."  But Yedid denied having any contact with Kaufman between

November 18, 2018 and January 29, 2019, despite, at a minimum, the three phone calls listed above.

*Defendants Were Confronted by the Federal Bureau of Investigation ("FBI") and Kaufman Destroyed Evidence*

103.    In November 2024, the FBI approached the Defendants and executed search warrants.  During interviews conducted in tandem with the executing of the warrants, Yedid denied tipping and Kaufman claimed that he did not trade on recommendations from Yedid. Kaufman then deleted a master trading spreadsheet he maintained and bought an untraceable phone for communications with Yedid.

104.    Jacobs admitted to the FBI that he had received tips from a friend but refused to identify who.

### CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (All Defendants)

105.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 to 104 as if fully set forth herein.

106.    Yedid knew that, as a senior employee and relationship manager at Consulting Firm, he was under a duty not to disclose nonpublic information that he learned about Consulting Firm clients.  In addition to his training and experience as a securities professional, he was also a board member of a public company, and he annually certified his understanding of confidentiality and insider trading rules.  Consulting Firm's contracts with its clients also made clear that client information must not be disclosed externally.

107.    In violation of his duty and Consulting Firm's client contracts, Yedid intentionally or recklessly conveyed material nonpublic information to Kaufman and Jacobs, who had both

worked in the securities industry.  Kaufman and Jacobs both also maintained multiple brokerage accounts, where they regularly traded stocks and options.

108.    Yedid received personal benefits from his tips.  Kaufman shared his illicit trading profits, net of taxes, with Yedid by handing Yedid envelopes of cash.  Yedid also received the benefit of providing gifts of information to close friends.

109.    Kaufman and Jacobs purchased stocks, sold short stocks, and purchased options, based on the material nonpublic information they received from Yedid.  Kaufman and Jacobs knew, or were reckless in not knowing, or consciously avoided knowing that the tips they received from Yedid were conveyed in breach of a fiduciary duty or similar obligation arising from a relationship of trust and confidence, and in exchange for a personal benefit.

110.    Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

111.    By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and unless restrained and enjoined will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

A.    Finding that the Defendants violated the provisions of the federal securities laws as alleged herein;

B.    In a form consistent with Federal Rule Civil Procedure 65(d), permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

C.    Permanently restraining and enjoining Yedid from, directly or indirectly, acting as or being associated with any broker or dealer;

D.    Ordering Defendants to disgorge their ill-gotten gains, to include on a joint and several basis if appropriate, plus prejudgment interest thereon, pursuant to Sections 21(d)(3)(5) and (7) of the Exchange Act, [15 U.S.C. § 78u(d)(3), (5), and (7)];

E.    Ordering Defendants to pay civil money penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

F.    Ordering that Defendant Robert Yedid be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

G.    Granting such other and further relief as this Court may deem just, equitable, and necessary.

## JURY DEMAND

The Commission demands a trial by jury on all issues so triable.

Dated: August 14, 2025                    Respectfully submitted,

                                          _____*/s/ Daniel Maher*_____
                                          Daniel Maher (*pro hac vice* filed herewith)
                                          SECURITIES AND EXCHANGE
                                          COMMISSION
                                          100 F Street, N.E.
                                          Washington, DC 20549
                                          (202) 551-4737
                                          MaherD@sec.gov
                                          *Counsel for Plaintiff*